MEMORANDUM OF DECISION
On February 4, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Crystal M. and Miguel R. to their two daughters, Jessica and Shonica. Neglect petitions had been earlier filed and were consolidated for hearing and disposition.
A. Procedural History.
The matters have had a lengthy procedural history. The petitions were tried on January 4 and January 5, 1999. Judgment was entered on the record on various dates, granting the termination petitions, but no written decision filed. (Holden, J.) Subsequently, on November 9, 1999, a motion to set aside the termination judgment and for a new trial was granted (Lopez, J.) and the matters assigned for trial in the Child Protection Session. The court received testimony and evidence as to Miguel R. on April 24, 2000. Counsel stipulated that the earlier trial transcripts and exhibits before Judge Holden could stand for the present CT Page 8568 trial. The matter was continued as to the mother, since Crystal M. personally appeared on April 24, 2000 and the court appointed new counsel for her. On June 9, 2000, the neglect petitions were amended to add that the parents had abandoned the children and the court received a stains report as to Jessica and Shonica. On June 30, 2000, Crystal M. consented to the termination of her parental rights as to all four children. The court found her consent to be knowingly and voluntarily made, with the advice and assistance of competent counsel. (Lopez, J.) On July 13, 2000, the continued trial resumed. The termination petitions were then amended to reflect the mother's consent.
The termination petitions as to Miguel R. allege that the children were adjudicated neglected in prior proceedings and that he has failed to rehabilitate so that he could parent his two children. In addition, the petitions allege that the children have been denied, by reason of an act or acts of commission or omission by the father the care, guidance or control necessary for their physical, educational, moral or emotional well being. Jessica and Shonica remain in DCF's care pursuant to an order of temporary custody granted on February 7, 1997 and on April 29, 1997, respectively. (McLachlan, J.) The neglect petitions filed on February 7, 1997 allege that the children are being denied proper care and attention and that they are being permitted to live under conditions, circumstances or associations injurious to their well being. An amended summary of facts was filed on February 18, 1998. As noted, abandonment as a neglect ground was added on June 9, 2000.
From the evidence presented, the court finds the following facts:
B. Facts
1. Miguel R., the father of Jessica and Shonica R.
Miguel R. is now forty-eight years old. He has a significant substance abuse problem of long standing. He has admitted that he began using drugs when he was sixteen. His drug of choice is crack-cocaine. He also suffers from serous and debilitating medical conditions including chronic obstructive pulmonary disease, congestive heart failure as well as morbid obesity. He apparently receives social security disability payments and has not been employed for many years.
Miguel R.'s relationship with Crystal began when she was a teenager. Miguel is some fifteen years older than she and was also involved with Crystal's mother, unfortunately also a drug-user. Crystal and Miguel had an older child, born in 1988. Their rights to this child were terminated in 1989 and she has been adopted. The family's living conditions due to their drug abuse were chaotic and involved both domestic violence and CT Page 8569 ongoing criminal activity. Use of illegal substances by both Miguel and Crystal brought about a long involvement with DCF with this family. Crystal and Jessica tested positive for cocaine at the time of Jessica's birth. Crystal admitted that she had used cocaine five days before the delivery and had received no prenatal care. The next child, Shonica, was born less than two years later in May, 1992. By 1993, DCF had received several community referrals about the parents' drug use. Both girls had been briefly removed from their parents by DCF in April, 1993 and then returned, when a service agreement was signed with the parents. On July 18, 1993, the children's maternal grandmother called the Careline to inform DCF that the children had been left with her for several days by their mother, who had not returned for the children and that she did not know the parent's whereabouts. This was not the first time the children had been left behind, as the parents were heavily involved in drug use in 1992 and 1993.
Jessica and Shonica were then removed on an order of temporary custody on July 21, 1993 and were committed to the care and custody of the Commissioner of DCF on October 31, 1994, a year later. During this time, expectations were set for both parents, and DCF made referrals for Miguel for substance abuse treatment. He cooperated with a substance abuse evaluation at Connecticut Counseling Center in December, 1995. At that time, it was recommended that he enter inpatient substance abuse treatment, which he refused to do. He himself reported that he received drug treatment in the same year at the Joseph Center. There, he also was directed to seek inpatient treatment, which he did not do.
Crystal apparently did improve her circumstances and began rehabilitation during this time. On January 3, 1996, DCF believed progress had been made and the two girls were returned to their mother, under a year of protective supervision. The year before the children were returned to her care, in 1995, Crystal had begun a relationship with Carlos Ivan P., the father of her youngest two children. After that time, Crystal and Miguel were not regularly living together. Nonetheless, Miguel had contact with Crystal regularly, more for the purpose of engaging in drug use than in having contact with his two daughters. Miguel has admitted that Crystal and he abused substances together and the DCF social worker characterized him as enabling Crystal's drug use.
Shortly after the expiration of the year of protective supervision, on February 7, 1997, DCF filed neglect petitions regarding both girls and also sought orders of temporary custody. The incidents giving rise to the order of temporary custody were that Crystal was permitting her boyfriend Carlos into her apartment, despite a protective order against him as well as pending charges against him for charges of risk of injury to Jessica. CT Page 8570 As noted, Jessica was placed in foster care at that time. Shonica was living with her maternal grandmother. The order regarding Shonica was denied and she remained in the care of her maternal grandmother, who received temporary custody of this child on March 5, 1997. A little over a month later, on April 25, 1997, Shonica was removed from her grandmother's care on an order of temporary custody. Her grandmother admitted to DCF that she had left Shonica in Crystal's care, knowing that Crystal was under the influence of drugs, unfit to care for the child.
Again, expectations were entered for both parents. Miguel did not offer to become the caretaker for the girls at the time they were removed from their mother and grandmother. Again, referrals were made for him for substance abuse treatment. Those referrals were to the Morris Foundation and for counseling at the Child Guidance Clinic with a bi-lingual counselor. He did not attend any substance abuse treatment. There were random urine screens that detected cocaine in his system in May, 1997. The evaluation by the Morris Foundation in that year again recommended in-patient hospitalization for Miguel at Waterbury or St. Mary's Hospital. The evidence is clear that Miguel refused such treatment. During the years that the neglect and termination petitions were pending, Miguel has never sought and received the long-term in-patient substance abuse treatment that has been recommended for him.
An intern from Family Services testified regarding his work with Miguel at that institution. He stated that he had met with Miguel for four sessions starting in November, 1998. During those sessions, Miguel told him that he had not used drugs for a period of eight years. The previous therapist for Miguel had been bi-lingual, but the intern was not. He testified that nonetheless he and Miguel were able to communicate. The intern was unaware of Miguel's drug screen showing the presence of drugs in 1997. He testified that Miguel had stated he had contact in December, 1998 with Crystal, who was still using drugs. This concerned him, because it reflected on Miguel's ability to lead a drug free life. The intern did not independently investigate any of the facts asserted by Miguel and believed that he was making progress.
Miguel had earlier stated to the DCF social worker that he did not need to abide by the court ordered expectations because he did not desire reunification. Although he denied this precise statement at trial on January 5, 1999, he testified that he wanted his children to remain in the foster home where they are. He was not really seeking custody. He stated: "I am not interested in that, really." The court concludes from the clear and convincing evidence that Miguel R. is not prepared to be the children's primary caretaker. Miguel also testified that he nonetheless does not wish to lose his parental rights to these two children. He testified that he has a total of seven children. One, as CT Page 8571 previously found, has been adopted. Two are adults and none of the others reside or have resided with him. He also does not provide support for any of his children.
Miguel R. did receive weekly supervised visitation with his two children for a period of time. Those sessions ended in the summer of 1997. Prior to their cessation, there were some visits that were missed by Miguel. His counsel argued vigorously that the court had ordered DCF to assist Miguel with visitation, inferring that DFC was to provide transportation to visitation, which they failed to do. In the context of this case and the evidence, the court does not find that this was so. The court does find the order entered by the court required DFC to provide assistance. However, Miguel came to visitation sessions either through rides provided by his friends or on occasions by taxi. When he needed a ride for other reasons, he did contact DCF and they provided such transportation. The court concludes that his failure to exercise visitation was not due to the lack of transportation.
After some weeks of visitation, there was a scheduled visit, which Miguel did not attend during which both children were acting out. At that time and as will be detailed below, their therapist was very concerned about their welfare and believed that continued visitation would jeopardize their stability. She recommended visitation cease. In addition, Dr. Mantell, who had preformed a court-ordered evaluation reported, "The mother, the father and the grandmother are seen as suffering from personality disorders that impart their ability to develop and discharge a normal range of child care responsibility. Mr. R.'s appearance alone suggests that he would be unable to physically attend to the responsibilities of child care."[2] On the basis of these concerns, DCF terminated further visitation and it was never again restarted. As a consequence, at the time of the hearing on January 5, 1999, Miguel R. had not seen his children for a considerable length of time, since August 13, 1997.
2. The children, Jessica and Shonica R.
Jessica is now ten years old. She was drug-exposed at birth and has clear memories of the drug activities of her mother, her father and their acquaintances. She has pointed out to the DCF social worker, when being driven to visitation and appointments, where the various crack houses her parents visited are located. She had reported domestic violence between her mother and father. She can remember that some of the time their father was with them, she and her sister assisted him in getting dressed, as he requires such assistance. Jessica has described that her parents would "do drugs" in front of the girls. She does not now speak of her biological father and does not wish to be with her mother. CT Page 8572
When Jessica first came into care in 1997, her therapist diagnosed her as suffering from Post Traumatic Stress Disorder, psychomotor retardation and severe separation anxiety. The therapist connected those symptoms to the treatment and severe neglect this child suffered while in the care of her birth family. Jessica herself remains very angry, particularly at her mother for abusing drugs again, according to her social worker. Dr. Mantell described Jessica as being "strikingly immature" for her age.
Unfortunately for Jessica, her stays in foster care have also proved problematic, because of frequent changes. In total, this child has been in nine foster homes. The foster home in which she resided at the time of the hearing in 1999 in which she was content and where she wanted to stay also ended. These foster parents had worked with the girls and DCF to make sure the girls had some communication with the foster parents with whom they were placed for over two years, prior to being returned to their mother in 1996, so that the children could make some sense out of their early life course. However, first her foster parents divorced and then her foster father requested her removal from the home on March 9, 2000. She did not take well to this change and is now in the second foster home since that time, where she is doing well. This home is able to deal with her special needs, as she requires patient care and long term counseling. She is in third grade in school and is in a regular classroom. She is doing better than her sister, Shonica, who was briefly hospitalized and then placed in residential treatment.
Shonica is now eight years old. She, in addition to being in the care of a foster family for two years prior to returning to the care of her mother in 1996, was also in the care of grandmother for a substantial period of time. While she was with her grandmother, she defecated and urinated regularly on the floor. When she acted out during the missed visitation session with her father described above and at several other times, she would grunt like an animal and run around, not aware of where she was or what she was doing. These disassociative behaviors caused the therapist for the child great concern and Shonica has received treatment for them. Her therapist has reported that Shonica requires constant reassurance that she will not be abandoned and needs to use a transitional object to help her keep calm. When she was removed from her foster father in March, she required several psychiatric hospitalizations. She has been now been placed in a residential home which can manage her behaviors and stabilize her. She has attended school there and is in the second grade.
C. Neglect Adjudication
The first matters to be considered by the court are the pending neglect CT Page 8573 petitions for both children. In hearing coterminous petitions for neglect and termination, the court "first adjudicates whether there is neglect. Only when a finding of neglect is made does the court move on to the dispositional phase of the neglect petition. Disposition in a neglect petition may take one of a number of forms, including return to parent, return to parents with a protective order, foster care placement or the initiation of proceedings to terminate parental rights." In re Juvenile Appeal (84-AB), 192 Conn. 254, 261, 446 A.2d 808, (1984). (Internal citations omitted.) The standard of proof in the neglect phase is by a fair preponderance of the evidence and in the termination phase. if reached, by clear and convincing evidence, a more stringent requirement. Connecticut Practice Book (Rev. 1998) § 33.12, Connecticut General Statutes § 17a-112(b).
For purposes of this action, the court treats the consolidated neglect and termination petitions as co-terminous. See In re Felicia D.,35 Conn. App. 490, 496, 497, 646 A.2d 862 (1994). In accordance with the statutory requirements and the case law, the court finds by a fair preponderance of the evidence that the biological parents have neglected their children in that the children were denied proper care and attention. Their mother's drug use, their chaotic home life and their father's unavailability to them as a nurturing caretaker are all facts supporting this conclusion. It is uncontroverted that the children were being permitted to live in conditions injurious to their well being. They were watching their mother and on occasion their father use drugs in their presence, they were taken to crack houses and exposed to the other individuals whom their mother indiscriminately permitted into their home has well, Their basic care needs for clothing, cleanliness and food were often not met. On June 9, 2000, the petitions were amended to add that the children had been abandoned by their parents. The court also finds this ground proven by a preponderance of the evidence. At the time of Jessica's removal from her mother and Shonica's removal from her grandmother, both biological parents had abandoned them and were unavailable to care for them.
D. Adjudicatory Termination Findings
1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent. . . . ." Connecticut General Statutes § 17a-112(c)(1). The court has noted the many referrals for substance abuse treatment and other programs offered to Miguel. The court finds that these services were suited to his needs and that they were reasonable. As stated, they continued for a considerable CT Page 8574 period of time, during which Miguel did not demonstrate any progress. In particular, he was never able to address his use of illegal substances. The court finds, from the clear and convincing evidence, that DCF made more than reasonable efforts to reunify him with his children, which by his own testimony he does not desire.
2. Miguel R.'s Failure to Rehabilitate.
The court further finds, by clear and convincing evidence, that as of the adjudicatory date, Miguel R. had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of his children he could assume a responsible position in their lives. This court has previously adjudicated both Jessica and Shonica neglected children. "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M, 6 Conn. App. 194, 203, 504 A.2d 532 (1986), see also In re Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795 (1984). Miguel has never adequately dealt with his drug addiction and has not rehabilitated himself so that he could parent any child. He has himself testified that he does not wish to have the daily care of these children.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis G., 210 Conn. 157, 1167, 554 A.2d 722 (1989), In re Hector L., 53 Conn. App. 359, 366-367, 730 A.2d 106 (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court must consider not only Miguel's conduct prior to the filing of those petitions, but also his conduct since that time. While he attended four counseling sessions in late 1998 and expressed his wishes to have visitation with his daughters, the court finds that he did nothing to rehabilitate himself in any meaningful sense. The court does not credit his assertions to his counselor that he had not used drugs for eight years. There is clear evidence that he had used drugs only one year prior to his meeting with the counselor. The court further concludes that he did not begin to meet the expectations set for him. He has no awareness of the needs of his daughters, other than to assert that they should remain with their foster parents. This is not the voice of a man working actively to reunify with his children, so that he can parent them. Indeed, it appears that he has not actively parented any child for any length of time and none of his children reside with him. Further, he has not inquired about these children's welfare. Given his history and pattern of conduct, the court concludes that Miguel R. cannot be rehabilitated as a parent of Jessica or Shonica within the reasonably CT Page 8575 foreseeable future, consistent with their needs for permanency. As to this ground for termination of his parental rights, the court finds that the facts and circumstances giving rise to them had been in existence for more than a year prior to the filing of the termination petitions.
3. Omission and Commission Grounds alleged against Miguel R.
The petitions allege that the children have been denied, by reason of an act or acts of commission or omission......by their father, the care, guidance or control necessary to their physical, educational or emotional well being. Connecticut General Statues § 17a-112(c)(3)(C). Counsel for the father at trial and in his brief argues strenuously that DCF did not present clear and convincing evidence on all grounds and in particular on this ground. Therefore, he argues the petitions should be dismissed. The case law sets the requirements for proof on this ground, "which requires that the acts or omissions alleged inflicted serious injury on the children. In re Kelly S., 29 Conn. App. 600, 614,616 A.2d 116 (1992), In re Sean H., 24 Conn. App. 135, 144-145,586 A.2d 1171 (1991). Miguel's claims for dismissal appear premised on two grounds: (1) there is no evidence that Miguel committed any acts injuring his children and (2) the indirect evidence as to the children's psychological condition is both unconvincing and not causally connected to his conduct, about which there is no evidence. The court disagrees.
During the period of time until 1995, when Crystal and Miguel were together, it is uncontroverted that both engaged in active drug use. At that time, their two daughters were very young. Both Crystal and Miguel's drug use continued for years, even after their separation. Jessica went to crack houses so that her parents could do drugs, exposing her to people and places no child should be exposed to.
The evidence in this case points to no specific acts by the biological father, but the evidence as to his failure to act or omissions is clear and convincing. Miguel knew that Crystal, the primary parent and caretaker, used crack-cocaine and that she was not able to care for the children when she was using. He was aware that she engaged in prostitution to secure money for drugs. He knew, as he also came along at times, that she took the children with her to secure and use drugs, exposing the children to criminal activity. Knowing all this, he took no action to protect these children. He did not do so while living with Crystal and he did not do so afterwards, although the evidence shows that as late as December 1998 he was aware Crystal was using drugs. He never offered himself or anyone else as a viable resource for the children, to remove them from the extreme neglect they suffered while in the care of their mother. CT Page 8576
Turning now to the claim that there is no evidence of injury to the children, there is ample such evidence. When the children were first removed from their mother's care, they were found by the professionals to have significant special needs occasioned by the life of extreme neglect they experienced in their birth family. They both had extreme fears of abandonment, which unfortunately were not allayed by their multiple foster families while in DCF's care, but which the professionals noted in the first instance shortly after their removal from their parents. The court cannot close its eyes to such clear and convincing evidence, even if the professionals did not testify at trial and their actual reports were not exhibits. Their conclusions were part of the social studies admitted into evidence in full, and not objected to. They are reliable hearsay by those who have a duty to report to DCF. As such, their conclusions are evidence for the court to consider.
From the evidence, which the court reviewed in detail and considered in this light, the court concludes that Miguel R.'s failure to act inflicted serious emotional injury on his children, for which they will require ongoing treatment. The court further concludes that DCF has proven, by clear and convincing evidence, that Miguel R. engaged in acts of omission which denied his children the care, guidance, and control they each required for their physical, emotional and moral well being. In addition, he did so for more than one year during the time prior to the filing of the termination petitions.
E. Required Findings
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e):
(1) Appropriate and timely services were provided by DCF to the family. These included services to benefit the children, referrals for Miguel R. to deal with issues of domestic violence, parenting and substance abuse. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence that reasonable services were provided to Miguel R.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Miguel R. and he was not minimally able to fulfill them.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised CT Page 8577 physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. While Jessica has only been in her foster home for a short time, her needs are being met there. She has no interest in being with her mother or father and does not speak of them. Shonica is in a fragile condition and has been stabilized in the residential home in which she has been placed. It remains to be determined whether she can be placed in a foster home in the future.
5) Finding regarding the ages of the children: Jessica is ten and Shonica is eight.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of these children.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children or the unreasonable act of any other person or by the economic circumstances of the parents. No such conduct is noted. DCF took steps for many years to assist this family.
F. Disposition
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the children at issue. As has been noted:
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds CT Page 8578 to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that all grounds for termination of Miguel R.'s parental rights have been proven by clear and convincing evidence in this case. The children's mother has consented to the termination of her parental rights. The court has made the seven statutory findings required, which all weigh in favor of termination being in these children's best interests. The court concludes, from the clear and convincing evidence, that there is no biological parent who will be able to care for these children. The court further concludes, from the clear and convincing testimony, that the children require permanency and stability in their lives. The court finds that termination of their parents's rights to Jessica and Shonica R. is in their best interests.
Based on the foregoing, the court orders a termination of the parental rights of Crystal M. and Miguel R. The Commissioner of the Department of Children and Families is hereby appointed the children's statutory parent. The court also orders that a permanency plan for these terminated children be submitted within sixty days. A review plan for them shall be filed in accordance with state and federal law.
 __________________________________ Barbara M. Quinn, Presiding Judge Child Protection Session